# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 22-792V

|  |  |
|---|---|
| MARCO DE LEON, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: February 5, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Wendy Cox, Siri & Glimstad, LLP, Austin, TX, for Petitioner.*

*Mallori Browne Openchowski, U.S. Department of Justice, Washington, DC, for Respondent.*

**RULING ON ENTITLMENT**[1]

On July 21, 2022, Marco De Leon filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table injury - that he suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving an influenza ("flu") vaccine in his left

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

deltoid on August 30, 2021. Petition at 1, ¶¶ 3, 8 (ECF No.1). The case was assigned to the Special Processing Unit of the Office of Special Masters.

After a full review of the evidence, and for the reasons set forth below, I find that Petitioner has established by preponderant evidence all requirements for a SIRVA Table injury, and is otherwise entitled to compensation for his injury.

## I.    Relevant Procedural History

On October 6, 2023, Petitioner filed a Motion for Ruling on the Record ("Motion") in support of the claim. ECF. No. 26. In reaction, on December 8, 2023, Respondent filed a combined Response to Petitioner's Motion for Ruling on the Record and Rule 4(c) Report ("Response"). ECF No. 31. Respondent argues that Petitioner has failed to demonstrate that he "suffered the residual effects or complications" of his alleged SIRVA injury "for more than 6 months after the administration of [his flu] vaccine" as required under Section 11(c)(1)(D)(i) of the Act, and thus Petitioner's claim must be dismissed. *Id.* at 6-8. Petitioner filed his Reply brief on January 8, 2024. ECF No. 32.  Thereafter, Petitioner filed updated medical records on January 24, 2024 and August 18, 2025, as well as a Status Report on February 5, 2024 offering further argument. ECF Nos. 34-35, 39.

This matter is ripe for my resolution.

## II.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule

does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical

records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

4

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## III.    Finding of Fact

I make these findings after a complete review of the record, including all medical records, declarations, Respondent's Rule 4 Report, the parties' briefs and other arguments, and additional evidence filed. However, I discuss only the most relevant medical records and other evidence below.

### A.  Medical Records

- Prior to vaccination, Petitioner's medical history included hypertension, diverticulitis, a colostomy and GERD. *See, e.g.*, Ex. 3 at 13; Ex. 6 at 2, 96, 123, 404, 474. There was no history of a left shoulder injury.

- On August 30, 2021, Petitioner received a flu vaccine in his left deltoid at a CVS Pharmacy. Ex. 2 at 2. At this visit, Petitioner also received a Covid-19 vaccine in his right deltoid. *Id.* at 8.

- On September 10, 2021, Petitioner had a televisit with internal medicine physician, Miguel Martinez, M.D., to establish care as a new patient. Ex. 3 at 13. Petitioner discussed his prescription medications with Dr. Martinez and requested medication refills. It was noted that he last had a physical exam a year prior, and was doing well otherwise. *Id.* There was no discussion of left shoulder pain at this appointment. *Id.*

- On September 15, 2021, Petitioner was seen by Dr. Martinez "for [l]eft shoulder pain following flu shot on 8/30/21." Ex. 3 at 10. Petitioner reported that "he developed severe left shoulder pain following his Influenza vaccine on 8/30/21." *Id.* The record notes that Petitioner was "unable to lift his arm due to the pain." *Id.* A physical examination found that Petitioner had limited active range of motion in the left shoulder. *Id.* Dr. Martinez noted that Petitioner may have "myositis." *Id.* Dr.

Martinez prescribed Petitioner a Medrol Dose Pack and a muscle relaxer for his pain. *Id.* at 11.

- One week later, on September 23, 2021, Petitioner was seen again by Dr. Martinez at a televisit for his left shoulder pain. Ex. 3 at 8. Petitioner reported that the Medrol Dose Pack had provided him some pain relief, but "the pain [wa]s still present with limited range of motion of the shoulder." *Id.* Dr. Martinez diagnosed Petitioner with left shoulder pain and prescribed "Voltaren gel in order to reduce inflammation" and provided Petitioner a referral to physical therapy. *Id.*

- Five days later, on September 28, 2021, Petitioner was seen by Megan Asher, N.P., at Dr. Martinez's practice, Zand Medical Partners, for his left shoulder pain. Ex. 3 at 5. Petitioner reported his pain was "progressively getting worse." *Id.* A physical examination of Petitioner's left shoulder was positive for decreased range of motion and strength. *Id.* at 6. Petitioner requested a work restriction letter which was provided and Ms. Asher recommended Petitioner "attend physical therapy." *Id.* at 5.

- On October 15, 2021, Petitioner began physical therapy Ex. 4 at 2. His physical therapist noted that he exhibited "[s]igns and symptoms consistent with L[eft] shoulder pain, likely due to possible impingement and arthritis caused by a flu shot to the L[eft] arm. Major problems at time include myofascial restrictions, shoulder and thoracic ROM deficits, scapulothoracic and glenohumeral weakness, scapular dyskinesis, and postural dysfunction." *Id.* It was noted that Petitioner's pain was aggravated when "reaching overhead, lifting, pulling, and getting dressed." *Id.* Petitioner's rated his pain at 7/10 at worst. *Id.* at 3. Petitioner was recommended to attend physical therapy twice a week for six to eight weeks. *Id.* at 5.

- That same day, Petitioner was seen again by Dr. Martinez for his left shoulder pain and an annual exam. Ex. 7 at 18. Petitioner reported "continued left shoulder pain and limited range of motion of his left shoulder." *Id.* Upon physical examination, Dr. Martinez noted that Petitioner had "[l]imited ROM [of the]j np[; left shoulder, pain on abduction," but had no pain on internal or external rotation. *Id.* at 19. Dr. Martinez ordered an MRI, and advised Petitioner to continue using the Voltaren gel, taking Cyclobenzaprine, and ibuprofen as needed for pain. *Id.* Dr. Martinz also wrote a letter advising he was placing Petitioner on "physical restrictions with limited lifting, pushing, or pulling for four weeks." Ex. 3 at 22.

- Petitioner returned to physical therapy on November 8, 2021. It was noted that he "[f]elt better after [his] first session but still has pain with abduction," and was getting an MRI. Ex. 4 at 6.

- On December 1, 2021, Petitioner underwent an MRI of his left shoulder. Ex. 3 at 19. The MRI findings included: subacromial/subdeltoid bursal fluid, mild to moderate acromioclavicular osteoarthritis with periarticular edema, mild tendinopathy of the supraspinatus and subscapularis tendons, and mild fraying of the anterior, inferior labrum. *Id.*

- Seven months later, on July 11, 2022, Petitioner was seen by Jasmine Sedaghati, PAC, at Zand Medical Partners for a televisit. Ex. 7 at 15. Ms. Sedaghati noted that Petitioner was being seen for "chronic left shoulder pain," and that he had "initially developed left shoulder pain last year in 9/2021 after his flu shot on 8/30/2021." *Id.* Petitioner reported that he had previously "completed a few sessions of physical therapy but stopped due to [the] cost." *Id.* Ms. Sedaghati observed that Petitioner "was referred to Dr. Ghalambor, orthopedic surgeon, but has not followed up." *Id.* [4] Ms. Sedaghati reviewed Petitioner's MRI with him which was "revealing bursitis" and recommended he follow up with Dr. Ghalambor for "further evaluation and treatment of [his] left shoulder pain and bursitis of [the] left shoulder." *Id.* at 15-16. Petitioner was also recommended to continue using the Voltaren gel for his left shoulder pain. *Id.* at 16.

- Petitioner was seen by Ms. Asher on August 8, 2022, for stomach pressure and discomfort – an issue unrelated to his shoulder pain. Ex. 7 at 12. Petitioner reported that he had a colostomy reversal in May 2022 and had been doing well.[5] *Id.* He stated that he worked a "very physical" maintenance job and that a few days prior he had been working in a ceiling and developed "severe" abdominal pain and was concerned that he had aggravated his colostomy surgical site. *Id.* Petitioner received a note stating he was to be on light work duty, and was recommended to follow-up with his colon and rectal surgeon. *Id.* At this appointment, Petitioner was also noted to have a diagnosis of "[c]hronic left shoulder pain" and advised to stop using the Voltaren gel. *Id.* at 14. Petitioner had a follow-up appointment with Ms. Asher on August 22, 2022 regarding his abdominal pain. Ex. 7 at 9.

- On October 14, 2022, Petitioner had a televisit with Ms. Sedaghati for evaluation of a bump on his neck and his left shoulder pain. Ex. 7 at 6. At this visit, Petitioner

---

[4] It appears that Petitioner may have scheduled with orthopedic surgeon, Navid Ghalambor, MD, for January 28, 2022 – but did not attend that appointment. *Id.* Ex. 8 at 4; Ex. 14 at 3.

[5] It does not appear that the records associated with Petitioner's colostomy reversal were filed.

stated that he had not yet followed up with Dr. Ghalambor, but that his left shoulder pain persisted, and he "report[ed] to now be ready to see Dr. Ghalambor being that he was more 'financially stable.'" *Id.*

- Petitioner was seen by Ms. Asher again on November 7, 2022, for multiple issues including chronic left shoulder pain. Ex. 7 at 2. Petitioner stated that he had been unable to schedule an appointment with Dr. Ghalambor "due to issues with insurance copays." *Id.* Petitioner stated he experienced "'pain with every movement' of his shoulder" and that he was "prescribed physical therapy, but that his copay was too expensive to keep up with." *Id.* Ms. Asher recommended Petitioner "follow physical therapy videos online to help with his left shoulder pain until he is able to see Dr. Ghalambor." *Id.*

- On February 14, 2023, Petitioner was seen by Onil Vallecillo, PA at Restore Orthopedics and Spine Center (Dr. Ghalambor's practice) for an "initial evaluation of left shoulder pain that began more than 1 year ago after he received a flu vaccine." Ex. 8 at 2. Petitioner reported that he experienced shoulder pain with activities, including: pushing, pulling, overhead lifting and sleeping on his left side. *Id.* Petitioner underwent an examination, and his treatment history was discussed. *Id.* at 2-3. It was noted that Petitioner had "failed conservative treatment with physical therapy and oral anti-inflammatory medications" and he consented to receive a "left shoulder subacromial space steroid injection" that same day. *Id.* at 3. Petitioner was diagnosed with "left shoulder impingement syndrome with subacromial bursitis," advised to continue his home exercise program, and follow-up in two months. *Id.* at 2-3. The following day, Petitioner received a work restriction note from Dr. Ghalambor stating he could return to work subject to "no pushing, pulling, l[i]fting [m]ore than 20lbs with [the] left arm until 4/17/2023." Ex. 10 at 4.

- On April 17, 2023, Petitioner was seen by Dr. Ghalambor. Ex. 9 at 2. Petitioner reported a 50 percent improvement in his symptoms following his steroid injection, although he still had "difficulty with overhead activities." *Id.* A physical examination of Petitioner's active range of motion was noted to be normal, but testing demonstrated a positive impingement sign and mildly positive Hawkin's test. *Id.* Dr. Ghalambor diagnosed Petitioner with "left shoulder impingement syndrome/subacromial bursitis per MRI scan dated December 1, 2021." *Id.* at 2. Various treatment options, including another steroid injection surgery were discussed with Petitioner. *Id.* at 3. Petitioner elected to proceed with physical therapy and was provided a prescription to do so. *Id.*

- Petitioner subsequently continued to seek medical care for his left shoulder over the next two years, albeit with additional gaps in his treatment. Petitioner's left shoulder injury culminated in a surgical procedure – a left shoulder arthroscopy with subacromial decompression – on June 4, 2025. Ex. 15 at 587-89.

### B. Other Evidence – Sworn Statements

Petitioner filed his own signed and sworn statement dated June 10, 2022. Ex. 1. Petitioner states he received a flu vaccine in his left arm on August 30, 2021 (plus a COVID vaccine in the other arm). *Id.* at 1. While he "barely" felt the vaccination in his right arm, he informed the pharmacist "that the one shot on my left arm had really hurt." *Id.* He states the "pain continued to get extreme to the point where I could not move my arm in any direction without having excruciating pain no matter what I did with my arm." *Id.* He described the pain as a "stabbing, burning, [and] pulling pain" which continued. *Id.*

Petitioner further states he informed the pharmacy on September 11, 2021 and was advised that it could be a vaccine administration injury and it was suggested that he see a doctor. Ex. 1 at 2. He went to doctor on September 15, 2021 and was initially "prescribed steroids and muscle relaxers which did not have much effect barely subduing the pain." *Id.* He later returned to the doctor because the pain was bad, and was referred for xrays, physical therapy, and "given an anti-inflammatory gel which is not working as well." *Id.* Petitioner notes that he was also given a work restriction note from the doctor "because I am no longer able to perform my duties due to the pain my arm is in." *Id.* Petitioner states that as his left arm is his dominant arm, he cannot "write, raise my arm in anyway, climb a latter, play with my little boy. My arm is useless at this point [June 10, 2022 – the date of the statement] and the pain never stops, the burning, stabbing pain." *Id.*

Petitioner also filed a sworn statement from Elizabeth Diaz, signed on October 10, 2023. Ex. 12. Ms. Diaz states that she is Petitioner's "partner" and that they "have been together since 2011 and live together." *Id.* at 1. Ms. Diaz recalls Petitioner's immediate pain following his August 30, 2021 flu vaccination and that he subsequently sought treatment for his shoulder in September 2021. *Id.* at 1-2. In her October 2023 statement, Ms. Diaz states that

> Marco has seen his doctor who has prescribed pain medications, steroids, muscle relaxers, injection, pain gel and physical therapy but Marco remains in pain. His doctor most recently told him that he needs surgery for his shoulder injury. Unfortunately, Marco lost his medical insurance and has

been unable to afford additional physical therapy and surgery for his ongoing pain.

To this day, Marco still suffers from the pain in his left shoulder/arm and is really limited in what he can do with his left shoulder/arm. He is hoping to get health insurance so that he can get the surgery and physical therapy that he needs.

*Id.* at 2.

## C. Severity

The only issue to be determined in this case is whether Petitioner has satisfied the Vaccine Act's "severity requirement," pursuant to which a petitioner must demonstrate that they:

(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D). To do so here, Petitioner would need to establish sequelae from his alleged persisted until at least SIRVA at least March 1, 2022 (assuming an onset of August 30, 2021).

A careful review of the record establishes that Petitioner more likely than not suffered the sequela of his injury for more than six months. As Respondent correctly notes, there is a lengthy treatment gap (December 2021 to July 2022) that "covers" the severity deadline. Response at 7. However, this does not automatically preclude a finding that a Petitioner likely suffered the sequela of their injury for at least six months. That question can be resolved be considering what the records on either side of the gap say about Petitioner's condition at the relevant time.

Here, it is generally established that Petitioner sought relatively-immediate care for is left shoulder pain - only 16 days after his vaccination - and then obtained treatment for it through his December 1, 2021 MRI (approximately three months after his vaccination). Ex. 3 at 10, 19. And that MRI establishes the existence of bursitis (along with other shoulder comorbidities commonly "discovered" by imaging in SIRVA cases, but which are not all attributable to the SIRVA). Thus, this record suggests the existence of some kind of injury at that time (as opposed to a resolved condition).

10

Then there are the records from mid-2022 onward, when Petitioner resumed care. They establish that the injury first reported that prior fall had yet to resolve. At the July 2022 visit, Ms. Sedaghati noted that Petitioner was being seen for "chronic left shoulder pain" stating Petitioner "initially developed left shoulder pain last year in 9/2021 after his flu shot on 8/30/2021." Ex. 7 at 15. Again, once Petitioner resumed orthopedic care, it was noted that he was being seen for an "initial evaluation of left shoulder pain that began more than 1 year ago after he received a flu vaccine." Ex. 8 at 2. Moreover, the symptoms Petitioner reported on February 14, 2023 of pain with certain activities, including: pushing, pulling, overhead lifting, were the same, or very similar, to the symptoms that he reported in 2021. *Id*; Ex. 3 at 22 (Dr. Martinez wrote a letter on October 15, 2021 advising he was placing Petitioner on "physical restrictions with limited lifting, pushing, or pulling for four weeks."). Finally, there is no evidence that Petitioner suffered an intervening shoulder injury.

Petitioner has also offered a reasonable explanation for the seven-month treatment gap. He argues in his Reply brief that he was unable to seek medical treatment during this time period due to his financial circumstances. Specifically asserting:

> [T]he only reason why Mr. De Leon did not receive treatment for several months was because he could not afford treatment during those months. For several months, Mr. De Leon was unable to attend physical therapy because he did not have insurance and/or the money to pay for the physical therapy himself. Furthermore, Mr. De Leon was facing the reality that he would lose his job, and health insurance, because he had an injured shoulder from a vaccination which limited his ability to work, along with the fact that he was having to miss work to attend so many doctor visits and physical therapy as a result of his SIRVA injury. During that period of time, Mr. De Leon's finances were such that he barely had enough money to pay for gas to get to work. Mr. De Leon had to make the decision whether to pay for gas and food or pay for physical therapy and doctor visits to treat his shoulder or face the likelihood that he would be terminated for missing more work.

Reply at 3.[6] And these contentions are corroborated by a number of contemporaneous treatment records from the summer of 2022 onward. *See* Ex. 7 at 15 (Petitioner reported

---

[6] While Petitioner did not address his gap in treatment and financial hardship in his own witness statement, Petitioner's partner (Ms. Diaz) did so, asserting that Petitioner "lost his medical insurance and has been unable to afford additional physical therapy and surgery for his ongoing pain." Ex. 12 at 2. However, Ms. Diaz does not *specifically* reference when Petitioner lost his medical insurance, and it may have occurred later - following his April 17, 2023, visit with Dr. Ghalambor - at which point it appears there is another gap

at his July 11, 2022 appointment that he "completed a few sessions of physical therapy but stopped due to [the] cost"); Ex. 7 at 6 (Petitioner reported at this October 14, 2022 medical visit that he was "ready to see [orthopedic surgeon,] Dr. Ghalambor being that he was more 'financially stable'"); Ex. 7 at 2 (At his November 7, 2022 medical visit, Petitioner stated that he had been unable to schedule an appointment with Dr. Ghalambor "due to issues with insurance copays." Petitioner further stated he experienced "'pain with every movement' of his shoulder" and was "prescribed physical therapy, but that his copay was too expensive to keep up with").

Accordingly, I find that Petitioner has established that he likely suffered the sequela of his August 30, 2021 flu vaccination for more than six months. This determination does not render the gap in treatment wholly irrelevant to the case, however. Although I accept the veracity of Petitioner's contentions that financial hardship played a role in his ability to obtain consistent treatment, the gaps still support the conclusion that Petitioner was able to manage his pain for fairly significant periods of time without treatment. This bears on any damages to be awarded.

### IV.    Table Requirements and Entitlement

Respondent agrees, and I find, that Petitioner has established all QAI requirements for a Table SIRVA claim. Response at 8, n. 4; 42 C.F.R. § 100.3(c)(10). There is no history of shoulder pain, inflammation, or dysfunction that would explain the post-vaccination injury. 42 C.F.R. § 100.3(c)(10)(i). Petitioner's pain occurred within 48 hours after receipt of an intramuscularly-administered vaccine. 42 C.F.R. § 100.3(c)(10)(ii). Petitioner's pain and reduced range of motion were limited to the shoulder in which the flu vaccine was administered. 42 C.F.R. § 100.3(c)(10)(iii). And there is not preponderant evidence of another condition that would explain the symptoms. 42 C.F.R. § 100.3(c)(10)(iv). And the additional requirements of Section 11(c), *i.e.*, receipt of a covered vaccine, *etc.*, are met. *See generally* Section 11(c)(1)(A)(B)(D)(E). I therefore find that Petitioner is entitled to compensation in this case.

---

in Petitioner's treatment. Ex. 9 at 2 (Petitioner's April 17, 2023 appointment with Dr. Ghalambor); Ex. 13 at 23 (Petitioner's next orthopedic appointment on November 10, 2023). Petitioner also appears to assert in his Motion that he lost his job and health insurance during this later time frame (after his April 17, 2023 appointment with Dr. Ghalambor) and was therefore unable to pursue further treatment at that time. Motion at 13-14.

## Conclusion

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. A Damages Order will issue.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master